```
             IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF TEXAS
                       HOUSTON DIVISION


CHINA NORTH CHEMICAL           §
INDUSTRIES CORPORATION,        §
                               §
           Plaintiff,          §
                               §
v.                             §    CIVIL ACTION NO. H-04-0912
                               §
BESTON CHEMICAL CORPORATION,   §
                               §
           Defendant.          §
```

MEMORANDUM AND ORDER

Pending is Plaintiff China North Chemical Industries Corporation's Motion for Partial Summary Judgment (Document No. 39). After carefully considering the motion, response, and the applicable law, and having heard the additional arguments and submissions of counsel in open Court on February 3, 2006 and in a telephone conference hearing on February 6, 2006, the Court concludes that the motion should be granted.

I.  Background

Plaintiff China North Chemical Industries Corporation ("Nocinco") alleges that Defendant Beston Chemical Corporation ("Beston") materially breached the parties' sales contract No. 90305H06-07 (the "Contract") by failing to pay Nocinco the

$2,077,464.60 balance due and owing under the Contract.[1]

Nocinco and Beston, which had a longstanding business relationship, on March 5, 1999, entered into the Contract under which Nocinco agreed to sell to Beston 718 pallets of explosive boosters (the "Cargo") deliverable "CIF" to Berwick, Louisiana, for which Beston agreed to pay $2,477,691.00.  *See* Document No. 40 ex. 1.[2]  The Contract provided that the Cargo would be shipped no later than September 30, 1999 and set forth a payment schedule, whereby 5% of the Contract price would be due ten days after presentation of the relevant transport documents to Beston, 10% would be due sixty days after presentation, and a percentage of the remaining balance would be due every thirty days thereafter, with the full Contract price due 180 days after presentation.  Id.

Nocinco did not have a license to transport cargo to

---

[1] Nocinco asserts an alternative claim for unjust enrichment that is not relevant to this Memorandum and Order.

[2] "CIF," which stands for "Cost, Insurance and Freight," is one of thirteen commercial trade terms defined in "Incoterms," which is published by the International Chamber of Commerce to "provide a set of international rules for the interpretation of the most commonly used trade terms in foreign trade."  INTERNATIONAL CHAMBER OF COMMERCE, INCOTERMS 1990 (1990) [hereinafter "INCOTERMS 1990"]; BP Oil Int'l, Ltd. v. Empresa Estatal Petoleos, 332 F.3d 333, 335 (5th Cir. 2003).  Specifically, Incoterms defines, with respect to each commercial term, what acts the seller must do to effect delivery, what acts the buyer must do to accommodate delivery, what costs each party must bear, and at what point in the delivery process the risk of loss passes from the seller to the buyer. *See* RALPH H. FOLSOM, ET AL., INTERNATIONAL BUSINESS TRANSACTIONS 72 (2d ed. 2001) [hereinafter "FOLSOM"].

international ports and therefore it contracted with Xin Shi Dai and its transportation unit, Zhong Xin, for transportation of the Cargo to Louisiana. Zhong Xin in turn contracted with Guangzhou Ocean Shipping Company ("Cosco"), which, through its agents and affiliates, booked the M/V NADIA J (the "Ship"), a ship owned by J. Poulsen Shipping A/S ("Poulsen") and specially licensed to carry explosives cargo. Nocinco also procured insurance coverage from the People's Insurance Company of China ("PICC"), insuring the Cargo during transport for 110% of its value.

The Contract did not specify how the Cargo would be stowed on board the transporting ship. Beston, however, on September 3, 1999, faxed to Nocinco a list of stowage requirements.[3] Upon receiving the fax, Nocinco contacted Beston by e-mail and stated:

> Your fax [was] well received this morning. According to the latest news from Xin Shi Dai, the vessel "NADIA J" will arrive in Xingang tomorrow, Mr. Gao and I will go to the port supervising the process of the loading. Just as you requested before, the cargo from Liaoyang and Shandong has been separated in our warehouse, different color code has been marked for each size on the top of carton, the same sizes of cargo will be loaded together. During the loading, we will try our best to properly block and barce [sic] the cargo, and no decks will be used as bulkhead. . . . As we know, the vessel is a tween deck ship, but we are not sure if we can leave a 20 feet x 20 feet area on each deck level, because we do not know if the hatch is big enough for leaving so big room. If the hatch is optimistic, we will stack the pallets as what you requested. Now all cargo has been palletized and shrink-wrapped with 45 cartons to a pallet.

---

[3] A copy of this fax is not included in the summary judgment evidence.

Document No. 49 ex. A.  Nocinco e-mailed Beston again on September 7, 1999, stating:

> We were informed today that the cargo under [the Contract] will be carried by the vessel named "NADIA J", which will leave Xingang for Berwick on September 11, 1999.  Now we are preparing for the loading at our port.  If you have any question, please let us know a.s.a.p.

Id. ex. B.

The next day, Beston replied to Nocinco's e-mail as follows:

> Please answer the following questions immediately:
>
> . . .
>
> 4.   Is this a tween deck ship?  If so, we have requested that pallets be pre slung (nylon straps) for 20 feet x 20 feet area from the top of the cargo to the bottom of the cargo space (deck) on each deck level so that we can rapidly offload these pallets and put a lift truck in the hold to offload the cargo.  Has this been done?
>
> 5.   We will allow NO decks to be used as bulk heads – the decks must be complete and protect the entire cargo for that deck.  We will allow no cargo to be stacked by removing any decking between decks whatsoever!
>
> 6.   All cargo must be properly blocked and braced to prevent movement and damage to the cargo during transport.
>
> . . .
>
> 10.  Will NOCINCO personnel that has visited the Berwick Port and is totally knowledgeable with the loading and ship requirements be at the port to supervise?
>
> 11.  ALL cargo must be palletized and shrink wrapped – 45 cartons to a pallet with full pallets – has this been done?
>
> We had requested that we send the owner of the port to China to supervise the shipment, however, there is no way we can be there in this short period of time to supervise

4

>   the loading.  We were told the ship would not load until
>   September 20 to 25th.  Why were we not informed regarding
>   the loading time of the vessel?
>
>   We advised NOCINCO many times that the above points MUST
>   be guaranteed.  These points were all pre conditions to
>   our acceptance of this contract and shipment.  NOCINCO
>   MUST guarantee that these points will be complied with
>   and send proper documentation (proof) to assure us that
>   all conditions have been met.  ANY points that have not
>   been met as required by proper US authorities regarding
>   this shipment, may prevent the ship from being able to
>   offload in Berwick.  Further shipments of 1.1D explosives
>   may NOT be allowed to the US Ports in the future.
>
>   Mr. Lui, I cannot tell you the importance of this
>   shipment being handled perfectly for this shipment.  I
>   have explained many times, if this shipment does not
>   comply to all regulations that this shipment as well as
>   future shipments may not be allowed to the US.  We cannot
>   and will not allow any mistakes!
>
>   Please respond to me as soon as possible.

Id. ex. D.  Beston sent another e-mail the following day, stating:

>   URGENT - URGENT - URGENT
>
>   . . . . It is critical that the following points be
>   handled including the points that I sent to you
>   yesterday!  Please confirm that you have received and
>   that you understand all POINTS!
>
>   4.   Explain the 20 x 20 pre slung pallets for lift truck
>   situation.
>
>   . . .
>
>   9.   All Bulkheads must be covered or line with Plywood
>   covering all exposed steel.
>
>   10.  Will the pallets be stacked three (3) layers high
>   per deck?  If so, we should put some kind of wood between
>   layers to prevent crushing.  Please make sure that both
>   decks are in place that will insure that the boosters
>   will NOT be crushed.

5

11. We MUST have a STOW PLAN from the ship owner showing how the cargo will be stowed. We need this for the permit to file with the US Coast Guard. We request that this be faxed to us today.

12. We have been told by a shipping competitor that the "NADIA J" will not be able to hold all 718 pallets with normal loading. The competitor recommends that we require the ship owner to supply a STOW PLAN confirming the normal loading conditions of the cargo and confirm that they will be able to store all 718 pallets.

13. Please take MANY photographs for all the phases of loading of the vessel, including:

a.   the ship and the position of the cranes
b.   the decks and holds of the ship
c.   the pallet condition before loading
d.   the pallets as loaded in the hold
e.   the color and markings of the cartons
f.   the blocking and bracing
g.   Any and all photos to prove the cargo were loaded with a clean bill of lading.

Mr. Lv. Tong, it is critically important to make sure the Captain of the ship loads the cargo correctly with NO removal of the decks and that the cargo is not CRUSHED. This was the case when the J. Poulsen shipped the last shipment on the "Thor Mette". They used the deck as a bulkhead and CRUSHED a great deal of our cargo. It is important that you and Mr. Gao are VERY STRICT as to the requirements of the loading of the ship and do not let the Captain or Stevedores allow the improper loading of this ship.

Please stay the entire time during the loading of the vessel. If we have problems, the US Coast Guard may never allow us to ship any future shipments to this port. The shipment must be absolutely perfect.

Thank you in advance to both Mr. Gao and yourself of the fine job that you will do. Beston and NOCINCO's future lies in the quality level of the job that you will do at the port supervising the loading of this vessel.

Id. ex. E.

On September 10, 1999, the Ship arrived in the port of Xingang in Tianjin, China. Two Nocinco representatives, along with representatives of Xin Shi Dai, Zhong Xin, and Cosco (collectively, the "Group"), convened at the port to observe the loading. The Nocinco representatives showed the Captain of the Ship and the Group Beston's September 3, 1999 fax, which had been translated into Chinese. As the loading progressed, however, the Group realized that the Ship was too small to accommodate all of the Cargo if the Ship used the "tween deck" structure that Beston had requested in its fax. Thus, Nocinco faxed Beston the following letter:

> URGENT!!
>
> . . .
>
> The vessel has called at Xingang, Tianjin at 12 o'clock. A serious problem has arisen before loading the cargo. According to the shipping company, they won't add any cover board to the separation chamber, altogether four layers of pallets will be piled directly. We are now trying to persuade the shipping company to arrange the cargo in compliance with your request. The shipping company says that after a board is covered, the space separation chamber is not enough for all of the cargo. If the board must be covered, we will have to give up this chance. Therefore, the shipment will be put off.
>
> Now the shipping company promised that they will furnish certain official letter to guarantee that, even without the cover board, the cargo won't be damaged. Now NOCINCO has to stick to the instructions forwarded by Beston to us from the U.S. Coast Guard, and we won't accept such promise unless the U.S. Coast Guard agree with the shipping company's suggestion. We are now still negotiating with the shipping company on this matter in order to find out a solution.

>We are also looking forward to you kind attention and coordination, and workable proposal if any.

Document No. 49 ex. F.[4]  After considerable discussion about what could be done, and arguments between Nocinco's representatives and the Captain about Beston's stowage requirements, the Captain agreed to guarantee safe passage of the Cargo and issued to Nocinco a Clean Liner Bill of Lading ("B/L") covering the Cargo.  *See* Document No. 40 ex. 2.  The Ship was then permitted to sail.

During the voyage, the Ship encountered storm conditions.  On September 23, 1999, the charterer e-mailed Beston to inform it that the Ship had hit rough seas and there were problems with the Cargo:

>Just had a tlx from the master advising that they are facing some problems with the cargo.  It is rocking from side to side.  Crew have been working on it for 5 days now but with little success.  Putting up more dunnage same breaks down again shortly after, even resulting in the boxes breaking down further.  Also tried various lashing measures, but with same result.  The boxes indeed do not remain stable on the pallets and during voyage need to avoid to vessel from putting side to the waves, which will make things even worse.
>
>We hope for good weather for the remaining voyage.

*Id.* ex. 8.  Beston replied to the charter as follows:

>Thank you for the information - I will contact China and advise.  I had specified to China the proper ship and loading conditions to properly handle the cargo, which included the cargo being properly loaded on the tween deck to prevent the type of damage you have conveyed to me.
>
>Please continue to keep me informed.

---

[4] There is no summary judgment evidence indicating that Beston responded to the fax.

Document No. 49 ex. G.

After receiving a copy of the charterer's e-mail, Nocinco e-mailed Beston on September 27, 1999, stating:

> Finally I got a copy of this e-mail . . . . I immediately went to Mr. Gao, who took care of the shipping arrangement in our department. He said that once there is any problem with the bracing and lining inside the cargo hold the booster pallets may very much possible to shift from one side to the other side. We contacted Xin Shi Dai this afternoon trying to find further details from them. It was surprised that they didn't receive any update from the shipping company yet. We asked them to contact the owner without any delay to get the information.
>
> From Mr. Gao's analysis, we can see there is the possibility of the problem. We believe it is true that the crew are facing the problem. From our side we will push the ship owner to take every measure to eliminate damages from the problem. Also we highly recommend that you contact the insurance agent in the United States to make sure that they are present at the port for unloading. Since we have the "clean on board" bill of lading we feel that we can get compensation from the shipping company if we get the proof of the damages, say photos, cargo condition report signed by the Captain, etc. In addition Mr. Gao asked if you can arrange a lien to the vessel through local court when you find the damages of boosters. . . .
>
> Should you have any questions or comments please don't be hesitated to contact me. No one wants to see this problem happen. We are praying for the good of the booster shipment. I feel sorry for all the pain you have taken for this shipment.

Id. ex. I.

When the Ship arrived in Louisiana on November 7, 1999, Beston and PICC agents who were present to inspect the Cargo found that it was no longer in good condition. Thomas V. Souza ("Souza"), who had been retained by Beston to perform a formal inspection of the

9

Cargo, found that the blocking and bracing were substandard and that the pallets had been stacked too high without sufficient support, causing them to break and crush the Cargo.  Document No. 40 ex. 10.  In his report, Souza noted, "This is one of the worst ship stowage I ever came across."  Id.  Similarly, Captain John Coxe of General Inspection Company of America, Inc., who had been retained by PICC to survey the Cargo, concluded that the damage was the result of improper stowage of the Cargo in the Ship, inadequate securing, and the heavy weather encountered during the voyage.  Id. ex. 11.

Thereafter, Beston made payments to Nocinco in December 1999, April 2000, and May 2000, for a total of 15% of the Contract price. Beston refused to pay the remaining balance, however, due to the Cargo's damaged condition.[5]  Thus, on March 4, 2004, Nocinco filed this suit against Beston to recover the remaining $2,077,464.60 due under the Contract, plus interest.  Nocinco now moves for partial summary judgment in its favor as to the issue of onboard damages to the Cargo, arguing that it fully performed its obligations under

---

[5] On November 3, 2000, Beston filed an admiralty action against the Ship and Poulsen asserting claims of "maritime tort and breach of maritime contract" based on the Ship's "failure to properly load, secure and stow the cargo."  Document No. 40 ex. 6. Beston settled those claims in October 2002 for $140,000.  Id. ex. 7.

On July 1, 2004, Beston brought a breach of insurance contract claim against PICC in Tianjing Maritime Court in China, but the court ruled on June 17, 2005 that the statute of limitations barred Beston's claim.  A Chinese appellate court upheld the ruling, and Beston is appealing the decision to the Chinese Supreme Court.

10

the Contract with regard to delivering the Cargo to the rail of the Ship.

## II. Summary Judgment Standard of Review

Rule 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The moving party must "demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 106 S. Ct. 2548, 2553 (1986).

Once the movant carries this burden, the burden shifts to the nonmovant to show that summary judgment should not be granted. Morris v. Covan World Wide Moving, Inc., 144 F.3d 377, 380 (5th Cir. 1998). A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials in a pleading, and unsubstantiated assertions that a fact issue exists will not suffice. Id. "[T]he nonmoving party must set forth specific facts showing the existence of a 'genuine' issue concerning every essential component of its case." Id.

In considering a motion for summary judgment, the district court must view the evidence "through the prism of the substantive evidentiary burden." Anderson v. Liberty Lobby, Inc., 106 S. Ct.

2505, 2513 (1986). All justifiable inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 106 S. Ct. 1348, 1356 (1986). "If the record, viewed in this light, could not lead a rational trier of fact to find" for the nonmovant, then summary judgment is proper. <u>Kelley v. Price-Macemon, Inc.</u>, 992 F.2d 1408, 1413 (5th Cir. 1993) (citing <u>Matsushita</u>, 106 S. Ct. at 1351). On the other hand, if "the factfinder could reasonably find in [the nonmovant's] favor, then summary judgment is improper." <u>Id.</u> Even if the standards of Rule 56 are met, a court has discretion to deny a motion for summary judgment if it believes that "the better course would be to proceed to a full trial." <u>Anderson</u>, 106 S. Ct. at 2513.

III. <u>Discussion</u>

The parties agree that their Contract is governed by the United Nations Convention on Contracts for the International Sale of Goods ("CISG"), 19 I.L.M. 668 (1990), *reprinted at* 15 U.S.C.A. Appendix (West 1997), a self-executing treaty between the United States and other signatories, including China.[6] Because Incoterms

---

[6] China has declared, however, that it is not bound by CISG Article 11--which provides that "[a] contract of sale need not be concluded in or evidenced by writing and is not subject to any other requirements as to form" and "may be proved by any means, including witnesses"--or the provisions in the CISG relating to the content of Article 11. *See* 15 U.S.C. App. B n.6 (Parties to the Convention--China); *see also* CISG Arts. 12, 96.

12

is the dominant source of definitions for the commercial delivery terms used by parties to international sales contracts, it is incorporated into the CISG through article 9(2), which provides:

> The parties are considered, unless otherwise agreed, to have impliedly made applicable to their contract or its formation a usage of which the parties knew or ought to have known and which in international trade is widely known to, and regularly observed by, parties to contracts of the type involved in the particular trade concerned.

BP Oil, 332 F.3d at 337; St. Paul Guardian Ins. Co. v. Neuromed Med. Sys. & Support, GmbH, 00-CV-9344, 2002 WL 465312, at *3-4 (S.D.N.Y. Mar. 26, 2002).

The Contract provides for "CIF" delivery of the Cargo to Berwick, Louisiana. Document No. 40 ex. 1. According to Incoterms 1990, which was in effect when the parties made the Contract, shipments designated "CIF" require the seller to procure and pay for the costs of transporting and insuring the goods to the destination port, but transfer the risk of loss to the buyer once the goods "pass the ship's rail" at the port of shipment. *See* INCOTERMS 1990; St. Paul Guardian Ins., 2002 WL 465312, at *4; FOLSOM, at 79; *see also* BP Oil, 332 F.3d at 338 (discussing the term "CFR," which is identical to the CIF term, except that the seller has no obligations with respect to cargo insurance). "In the event of subsequent damage or loss, the buyer generally must seek a remedy against the carrier or insurer." *See* BP Oil, 332 F.3d at 338.

Relying on the parties' inclusion of the CIF term in the

13

Contract, Nocinco argues that it fully performed its obligations under the Contract when it delivered the Cargo to the Ship in good condition, as evidenced by the clean B/L.  Nocinco concedes that the Cargo was improperly loaded and stowed on the Ship but contends that under the Contract's CIF term the risk of loss passed to Beston when the Cargo passed the Ship's rail; therefore, Beston, and not Nocinco, bore the risk of damage due to improper loading and/or stowing.  Thus, Nocinco argues, the fact that the Cargo arrived in Louisiana in damaged condition did not discharge Beston's obligation to pay the Contract price, and Beston has materially breached the Contract by withholding such payment.

In response, Beston argues that Nocinco did not perform the obligation it assumed in a series of fax and e-mail exchanges with Beston pertaining to Beston's requirements for the loading and stowage of the Cargo.  Beston contends that Nocinco in these written exchanges agreed to "ensure" that the Cargo was loaded and stowed in accordance with Beston's shipping requirements.  In other words, it is Beston's position that Nocinco assumed an additional obligation that does not appear on the face of the Contract.  Nocinco's permitting the Cargo to be loaded in a manner that contravened Beston's stowage requirements and allowing the Ship to sail, Beston argues, excused Beston from its duty to pay the Contract price for the Cargo.[7]

---

[7] Beston also contends that Nocinco breached the Contract because portions of the Cargo were defective and/or did not meet

The uncontroverted summary judgment evidence establishes that Beston informed Nocinco of its stowage requirements in a fax dated September 3, 1999 and in e-mails dated September 8, 1999 and September 9, 1999. *See* Document No. 49 exs. D, E. The summary judgment evidence of the faxes and e-mails relied upon by Beston, however, does not establish that Nocinco ever (1) assumed an obligation to ensure that the Ship's Captain loaded the Cargo properly and in accordance with Beston's stowage requirements, or (2) otherwise agreed to bear the risk of damage or loss after the Cargo passed the rail of the Ship. Although Nocinco, in its September 3, 1999 e-mail, acknowledged receipt of Beston's stowage requirements and indicated that some of those requirements (*e.g.*, color-coding and marking the Cargo by size) had been accommodated,

---

the Contract's quality specifications. Nocinco is not moving for summary judgment on this portion of Beston's claim, but only on Nocinco's liability for the Cargo's onboard damages suffered at sea.

Although Beston has not filed a motion under Fed. R. Civ. P. 56(f), Beston's counsel orally requested in the telephonic hearing that a ruling on Nocinco's partial summary judgment motion be deferred until he is able to take Mr. Gao's deposition. Since Beston contends that Nocinco's liability is based upon the written exchange of faxes and e-mails presented in the summary judgment evidence, and not on any separate oral understanding, it appears that nothing to which Mr. Gao may testify will assist Beston's position on this issue. Beston's assertion that the Ship's Captain provided to Mr. Gao a guarantee of some kind would at most affect only the liability of the Ship and its owner/charterer with whom Beston has already settled. Any guarantee received by Mr. Gao from the Ship's Captain could not impose an additional liability on Nocinco. Thus, Nocinco's motion for partial summary judgment on the onboard damage at sea issue is ripe for decision.

Nocinco also stated that it would "try [its] best" to see that others (e.g., stacking the pallets in the manner requested by Beston) would be met "if" the Ship's cargo hold was big enough. Id. ex. E.  Nocinco's statements cannot be construed as an agreement by Nocinco to "ensure" that the Cargo would be loaded and stowed in accordance with Beston's stowage requirements and/or an assumption of liability by Nocinco for damage to the Cargo resulting from improper stowage. Likewise, Nocinco's September 10, 1999 fax, in which Nocinco states it "has to stick to the instructions forwarded by Beston to us from the U.S. Coast Guard, and we won't accept such promise [of a certain official letter of guarantee that the Cargo would not be damaged] unless the U.S. Coast Guard agree with the shipping company's suggestion," does not constitute or evidence an agreement between the parties binding Nocinco to liability for damage to the Cargo resulting from improper stowage.[8]

---

[8] In the telephonic hearing conducted on February 6, 2006, Nocinco's counsel conceded that an underlying obligation of Nocinco was to ship its Cargo in compliance with U.S. Coast Guard regulations in order to ensure that the Cargo could be offloaded in Berwick, Louisiana. Counsel for Beston conceded that the Cargo was in fact offloaded in Berwick, Louisiana under U.S. Coast Guard supervision after some issues between the U.S. Coast Guard and Beston were resolved. It appears uncontroverted that the U.S. Coast Guard's requirements for receiving in a U.S. port a shipment of explosives involve a different set of considerations than Beston's set of requirements for the loading and stowage of the Cargo on the Ship.

Beston also relies upon a subsequent sales contract between the parties, in which they included specific shipping and stowage

To the contrary, the parties' unambiguous use of the "CIF" term in the Contract placed the risk of damage to the Cargo upon Beston when the Cargo passed the Ship's rail.  Whatever Nocinco did at Beston's urging to accommodate its customer's requirements for correct stowage of the Cargo, including the exchanges of e-mails that reported those activities, did not alter the CIF term contained in the parties' written Contract.  Moreover, the Ship's owner had a non-delegable duty under the Carriage of Goods By Sea Act ("COGSA") properly to load and stow the Cargo, and nothing in Nocinco's correspondence with Beston indicates that Nocinco agreed to act as the Ship's insurer with respect to that obligation. Thus, Nocinco fulfilled its obligations under the Contract when it provided to Beston the required insurance and delivered the Cargo to the Ship in good condition, and Nocinco is therefore not liable for the Cargo that was damaged at sea.  Nocinco is entitled to summary judgment in its favor on Beston's claim that Nocinco had assumed liability for the onboard damages to the Cargo at sea.

IV.  <u>Order</u>

Accordingly, it is

ORDERED that Plaintiff China North Chemical Corporation's

---

provisions, as evidence that the parties agreed that Nocinco would be responsible for stowage with respect to all of the parties' shipments.  *See* Document No. 49 at 3-4; ex. M.  Importantly, however, those provisions are not included in the Contract at issue in this case.  *See* Document No. 40 ex. 1.

17

Motion for Partial Summary Judgment (Document No. 39) is GRANTED, and Nocinco is entitled to recover the Contract price, subject to any offsets based upon Beston's claims that portions of the Cargo were defective and/or did not meet the Contract's quality specifications, which issue remains to be tried.

The Clerk shall notify all parties and provide them with a true copy of this Order.

SIGNED at Houston, Texas, on this 7th day of February, 2006.

Ewing Werlein, Jr.
United States District Judge